JOHN S. OTTLEY, Respondent, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, a Corporation, Appellant, No. 41703—232 S. W. (2d) 966.

Division One, September 11, 1950.

Motion for Rehearing or to Transfer to Banc Overruled, October 9, 1950.

E. G. Nahler, C. H. Skinker, Jr., and Thos. E. Deacy for appellant.

*David Trusty, Eugene R. Brouse* and *Sam Mandell* for respondent; *Popham, Thompson, Popham, Mandell & Trusty* of counsel.

LOZIER, C.—This is an appeal in a Federal Employers' Liability Act case wherein respondent (hereinafter called plaintiff) had verdict and judgment for $10,200. Appellant (hereinafter called defendant) contends that its motions for directed verdict should have been sustained and that plaintiff's main instruction is erroneous.

Plaintiff, a freight car inspector, sustained his injury while working in defendant's Rosedale, Kan., Freight Yard. This was a busy "classification" yard in which about 700 cars were received daily. It consisted, primarily, of a large number of parallel switch tracks, used in breaking and making freight trains and in transferring cars, or "cuts" (cars coupled together) from one train to another. These switch tracks ran northeast-southwest and at each end were connected with a lead track. Switch engine crews operated on and off of the lead tracks, "kicking in" or shunting cars or cuts upon some of the switch tracks and removing them from others.

Plaintiff was injured February 17, 1946. He and his working partner, Parrish, had completed inspection of cars on track 17 and were walking toward track 42 to inspect cars on that track. The direct route to ▮▮ track 42 was blocked by a string of about 30 empty hopper coal cars, coupled together, standing on track 20 with no engine attached. Instead of walking around either end car

or climbing over a car, plaintiff crawled beneath the couplers of two cars. These couplers were about 30 inches above the ties. When he was under the couplers, crawling on his hands and knees or crouched between the rails, a cut of 4 moving wheat-laden cars (which had been kicked in by the switch crew, operating on the southwest lead track) came in contact with the end car of the string. The entire string was moved and plaintiff's right foot was mashed by a moving car wheel, and he sustained other injuries.

Plaintiff pleaded that his duties required him to go to various parts of the yard for the purpose of inspecting cars and making light repairs; that on that occasion he was crossing the yard; that there was a long string of dead cars on the track; that "it was necessary for plaintiff to get across said track in order to carry out further duties and inspections and repairs assigned to him" by defendant; that "in order to go around said train it would have been necessary for him to travel several hundred feet, and in such circumstances he was ordered, directed and required" by defendant "to go under or over said standing cars, and it was part of his duties and orders to go under said standing cars at said time in order to cross said tracks and get on the other side; that he attempted in accordance with orders of his superior and in accordance with the usual custom and practice to pass under said standing cars and was in the act of so doing and engaged in performing his customary duties as aforesaid when and where" defendant "negligently and without warning caused said cars to be negligently and violently and with unusual and extraordinary and unnecessary force struck and violently knocked, shunted, rolled and moved" thereby injuring plaintiff.

The specific negligence alleged by plaintiff was defendant's "ordering, directing and requiring plaintiff to pass under said standing cars and violently and without warning colliding with and striking same" and "in so failing to provide and maintain a reasonably safe place to work and reasonably safe working conditions."

Defendant, after denying generally, answered that if plaintiff was injured on that occasion, then the injury "was directly caused by plaintiff's own careless and negligent failure to exercise ordinary care and caution for his own safety and by plaintiff's violation of safety rules and regulations of his employment by" defendant "and more particularly Rules 7, 35, 316 and 317." Defendant then set out these rules, viz.:

"Rule 7. Employees must not go between cars for any purpose without protection or knowing that cars or engines are not coming in from either end of track."

"Rule 35. Employees must never crawl under cars or equipment unless proper protection is provided."

Rules 316 and 317 set out the "blue flag" rule, relating to car inspectors or other employees *inspecting* or *working* upon, under or

about cars. The evidence of both parties showed that Rules 316 and 317 were not applicable here as plaintiff, when injured, was not inspecting or working upon, about or under the cars on track 20. Unless otherwise indicated, references hereinafter to rules or safety rules are to Rules 7 and 35.

At the time of his injury this 64-year-old plaintiff had been defendant's employee for 24 years. The preceding year he had worked in the Rosedale Yard. His duties as an inspector were the inspection of cars on the switch tracks and their safety appliances and the making of minor repairs. If he deemed major repairs necessary, he "bad ordered" the car, i. e., had it sent to a "rip" (repair) track. His work required him to cross and recross the switch tracks often each day.

Plaintiff testified that he was thoroughly familiar with the operations of the yard and the manner in which switch crews moved cars and cuts on and off switch tracks from the lead tracks; that cars could be kicked in on any switch track from either lead at any time, even when the switch engine on the lead track was 3 or 4 blocks away; that it was the usual procedure for cars to be kicked in on a track; that "they uncoupled them and they rolled on down to the other cars," by gravity and momentum; that "they let them go and hit the other cars"; that "they were moving cars all the time there"; that "cars were constantly moving everywhere"; that "we didn't know what time the switch engine would put cars in on any track" or "when the cars were coming in on any track"; and that "you just have the feeling that any car will move any minute down there."

Plaintiff stated that, at the time of the accident, he and Parrish were not engaged in the inspection of, or engaged in the performance of any duties relating to, the cars on track 20; that he knew that that track was being used as a track to "set in" cars; that he knew that these particular cars were there only temporarily; that he "knew it was dangerous to attempt to go between the cars without knowing whether or not they were going to be moved"; that "we came to this string and looked up and down both ways to see if anything was moving and there wasn't"; that to the southwest he could see as far as the lead switch to track 20 (500 or 600 feet from where he crawled under), but he could not see the lead track because cars standing on other switch tracks obstructed his view; that he knew a switch engine was working on that lead track; that when he was under the couplers something hit the string "a terrible jolt that started the cars rolling * * * about 25 or 30 feet before it came to a stop"; that this was "an unusual movement" and "not the kind they made every day"; and that, ordinarily, if the brakes on standing cars were set, a string would move only 8 or 10 inches.

1194

Plaintiff stated that he did not notify anyone that he intended to crawl under the couplers; that he "didn't say anything to Parrish"; and that. "when an engine drops cars against a cut, such as occurred in this case, we would not expect a signal from the engine as the switch crew would have no way of knowing when we were going through a cut of cars, as in this case."

Plaintiff had been given a rule book, had receipted for it and had familiarized himself with the rules. He. stated that he "was familiar with the rule that no men were supposed to crawl under cars"; that he "knew it was dangerous to attempt to go between these cars without knowing whether or not they were going to be moved"; and that "I simply took another chance in going through these standing cars, under the couplers, in this case, and it so happened that these cars moved when I was under there."

Plaintiff stated that inspectors usually did not "walk clear down to the end of a long string of cars to get across"; and that the usual practice was to "cut through" the cars, "sometimes we go over couplers, sometimes under couplers." There was no evidence that inspectors were ever directed to crawl *under* the cars or *under* the couplers. Plaintiff admitted that he had never received such instructions. He went only so far as to state that his foreman had said "not to walk around the ends of the cars, for us to cut across." As stated by plaintiff's counsel at the trial, plaintiff's testimony was that "he had never been instructed how to do it, just to get across."

Plaintiff testified that "it was. necessary to cut across to get the work done"; that the foreman and other inspectors "cut across"; and that "cutting across" was the general practice. There was evidence that it was even unusual for the inspectors to go *over* the couplers and that such practice was hazardous. In plaintiff's opinion, it was "too severe" to go over the *cars* and was "safer" to go under the couplers than over.

There was evidence, undisputed, that inspectors were given positive oral instructions not to crawl under cars without protection; that they were urged to follow the safety rules (including the "blue flag" rule when working on or under cars) and were admonished (their superiors had no authority to fine) when observed breaking them; that plaintiff had never been told to disregard Rule 7; and that he "didn't like to observe rules and was always cutting through trains." On the day of the accident, plaintiff had not received any specific instructions from his foreman and had not even seen him that day. Other employees testified that they had violated Rule 7, knew that such violation was dangerous and that "they were doing it at their own risk."

Plaintiff testified that *sometimes* a member of the switch crew "rode" the cars kicked in on a switch track and, by setting the

brakes, slowed down the movement; and that this was not done as to the cut switched in on track 20 that day. Stating that it was offered "for evidentiary purposes only," and that "we don't intend to submit on the rule," plaintiff's counsel put in evidence defendant's Rule 77. This rule was: "Caution and good judgment must be exercised when making couplings, and when starting and stopping trains, to avoid violent or sudden movement which might cause discomfort or injuries to passengers or employees."

Other than Rule 284, no rule, regulation, custom or practice required switch crews to sound signals or give car inspectors or other yard employees any notice or warning of switching movements. Rule 284 was: "Engines or cars must not be moved without first notifying all persons who may be *working under or about* them and after giving signal by whistle and/or bell." (Italics ours.) The blue flag rule was applicable to inspectors working on, under or about cars. It is conceded that plaintiff was not working under those cars. It is conceded that no member of the switch crew saw, or could have seen, plaintiff go under the couplers or had any knowledge or notice that he was on or near the track; and that plaintiff did not expect them to be "looking out" for him, or to notify him of the movement.

In plaintiff's main instruction the jury were instructed that if they found: (1) That it was the practice and custom "not to go around the end of such cars, but to go between the cars * * * in the manner that plaintiff was going and doing at the time of his injury"; *and* (2) that plaintiff's foreman instructed plaintiff not to go around the ends but "to go between the cars * * * as he was doing at the time of the injury"; *and* (3) that plaintiff "was doing so in accordance with * * * custom and practice" and was "working according to what his then foreman had instructed him to do," then defendant owed ordinary care to maintain the place (under the couplers) "in a reasonably safe condition while plaintiff was so going between such cars." The instruction required these further findings: that if, while plaintiff "was so going between said cars," other cars were permitted to strike them "with extraordinary and unusual and unnecessary force" and knock them "in a manner dangerous to plaintiff," and that, if defendant thereby failed to use ordinary care, defendant was negligent; and that if such negligence caused or contributed to plaintiff's injury, then verdict should be for plaintiff, even though the jury found that plaintiff was guilty of contributory negligence.

Observing that the instruction does not require a finding that the claimed violent movement of the wheat cars in on track 20 was *without warning* (as alleged in the petition), it is apparent that, under the circumstances here, defendant owed plaintiff no duty to warn him that these cars were about to be kicked in. Plaintiff conceded that no member of the switch crew knew he was under the couplers.

The crew had neither notice of plaintiff's intention to crawl under the couplers nor knowledge that he was there. The duties of the crew did not require them to ascertain if a car inspector was "cutting across" in violation of Rule 7. No rule, regulation, practice or custom required any other employee of defendant to sound a signal or to give inspectors notice or warning of intention to start such a movement. The nature both of these switching movements and of plaintiff's work were such that no warning was required.

In construing the Federal Employers' Liability Act, the Federal courts have held that, in the absence of a railroad rule or a custom to the contrary, there is no duty upon the railroad to warn or notify car inspectors of kicking in or other switching movements unless the employees in control and charge of such operations actually know, or have reason to believe, that the inspectors are in a position to be endangered thereby. Trust Co. of Chicago v. Erie R. Co., 165 F. 2d 806; Sumney v. Southern Ry. Co., 89 F. 2d 437; Chesapeake & O. R. Co. v. Mihas, 280 U. S. 102, 50 S. Ct. 42, 74 L. Ed. 207; Aerkfetz v. Humphreys, 145 U. S. 418, 12 S. Ct. 835, 36 L. Ed. 758. The same rule is stated in Missouri cases. See Finley v. St. L.-S. F. Ry. Co., 349 Mo. 330, 160 S. W. 2d 735; Grosvener v. N. Y. Cent. R. Co., 343 Mo. 611, 123 S. W. 2d 173; and O'Donnell v. B. & O. R. Co., 324 Mo. 1097, 29 S. W. 2d 929.

Here, no rule or custom required the switch crew, preliminary to the switching movement, to ascertain whether a car inspector was near the cars on track 20, or was starting to crawl under the couplers or was actually under them. Plaintiff recognized that he was required to look out for any moving cars on any switch track and did not expect to be warned of any switch movement in the yard. He had no right to expect, and he actually did not expect, warning or notice that the cars were to be kicked in. Cain v. Ft. Worth & Denver City Ry. Co., 75 F. 2d 103; Reading Co. v. Haldeman, 20 F. 2d 53; Martin v. Wabash R. Co., 325 Mo. 1107, 30 S. W. 2d 735; and Freeman v. Term. R. Assn. of St. Louis, 341 Mo. 288, 107 S. W. 2d 36. He had no duties to perform at the place he was injured; he was crawling under a car in violation of a safety rule. Cain v. Ft. Worth & Denver City R. Co., supra. We rule that defendant was under no duty to warn or notify plaintiff that these cars were to be or were being kicked in on track 20.

 Was plaintiff negligent in crawling under the couplers in violation of the rules and, if so, was such negligence the sole proximate cause of his injury? In his brief plaintiff seems neither to deny nor to concede that he was negligent, but argues that "neither contributory negligence nor assumption of risk are available to the defendant on its contentions that its motion for a directed verdict should have been sustained." True, assumption of risk is no longer a de-

fense and contributory negligence diminishes damages. See 45 U. S. C. A. Secs. 53 and 54, and cases cited thereunder.

However, these principles do not have the effect of permitting a plaintiff to recover if his own negligence is the sole proximate cause of his injury. The Federal courts have held that the amendment barring assumption of risk as a defense "has no bearing on the rule that an employee cannot recover for injuries resulting solely from his own fault." Willis v. Penn. R. Co., 122 F. 2d 248. It is only where "plaintiff's act is the sole cause of his injury and when defendant's act is no part of the causation," that defendant is free from liability under the act. Hough v. C. R. I. & P. Ry. Co., 339 Mo. 1169, 100 S. W. 2d 499. See Howard v. B. & O. C. T. R. Co., 327 Ill. App. 83, 63 N. E. 2d 774; Hunter v. Texas Elec. Ry. Co., (Tex. Civ. App.) 194 S. W. 2d 281; Henwood v. Coburn, 165 F. 2d 418; Frese v. C. B. & Q. R. Co., 290 Mo. 501, 263 U. S. 1, 44 S. Ct. 1, 68 L. Ed. 131; and Hampton v. Wabash R. Co., 356 Mo. 999, 204 S. W. 2d 708.

In 35 Am. Jur., p. 829, it is said: "In accord with the well-settled rule that there can be no recovery under the Federal Employers' Liability Act where the negligence of the employee is the sole proximate cause of the injury, it is very generally held that where a violation of a regulation or instruction promulgated by the employer is the sole proximate cause of the injury, there can be no recovery under the Federal Employers' Liability Act." So, if plaintiff's act (in crawling under the couplers in violation of defendant's safety rules) was negligence under the circumstances here, *and* if such negligence was the *sole* proximate cause of his injury, plaintiff cannot recover.

The record clearly shows that plaintiff's conduct was negligent. He was an inspector of long experience. Conceding that it was the practice or custom of some of the inspectors to "cut through," there was no evidence whatever that the practice or custom was to cut through *"without * * * knowing* that cars or engines are not coming in from either end of the track." (Rule 7, italics ours.) Plaintiff knew that the switch crew was working on the southwest lead track. His view was clear only 500 ■ or 600 feet. He could not see the engine or the cars it was moving on the lead track. When he came to track 20 that day he looked both ways, saw no moving cars and, as he admitted, "simply took another chance." He knew the rules defendant had promulgated for the safety of its employees. He knew what Rule 7 provided. He knew that "employees must *never crawl under cars* or equipment unless proper protection is provided." (Rule 35, italics ours.) He knew that by going around the end or by climbing over a car he could have safely reached the other side of track 20. He knew that he had never been instructed either to crawl under or to climb over the couplers. He knew there

were safe ways to cross the track. He knew the dangers; he knew that cars might be shunted to track 20 at any time without warning or notice of any kind. Obedience to the rules was possible and obedience would have prevented his injury. Yet, for his own convenience, he attempted to crawl through. He testified: "Q. Would you tell us why you would crawl under instead of going over? A. Too severe. * * * Q. Why didn't you go over on this occasion instead of under? A. Well, it is safer to go under. Q. Now you realize it was dangerous to attempt to go between these cars without knowing whether or not they were going to be moved, didn't you? A. Yes, sure we knew it. If you work around the railroad anything you do is dangerous."

Plaintiff expected no warning or notice from the switch crew, and he knew, from his long experience, that the members of that crew were not "on the lookout" for car inspectors and that, even if they were required to do so and were "on the lookout," none were in a position to observe him. He knew that they could not have seen him under the couplers and that, if they had seen him approaching track 20, they would not have assumed that he intended to violate the rules and crawl under the couplers. It was plaintiff's duty to look out for the cars and not the switchmen's duty to look out for plaintiff.

Plaintiff contends that crawling under the couplers in violation of the rules was not negligent upon two theories: (1) Orders of his foreman while engaged in the performance of his customary duties *and* (2) practice and custom. He predicated his request for a verdict upon both. As to the first, there was a complete failure of proof. Plaintiff himself unequivocally testified that his foreman had never instructed him to crawl under the couplers, adding, "instructions was to cut between the cars." He was never instructed to cut through without *knowing* that cars were not being kicked in. He was never instructed to "cut between" cars in violation of the rules. There was no evidence whatever, and plaintiff did not testify, that the instructions plaintiff received were directions to perform his work in violation of the safety rules. Rather, the instructions appear to have been given upon the assumption that they would be carried out in observance, not in defiance, of the rules and that plaintiff so understood them. Plaintiff failed to prove any orders from his superior which would excuse the doing of an act which plaintiff knew to be dangerous and in flagrant violation of the rules.

There was evidence that other car inspectors crawled under couplers. But there was no evidence, nor even an intimation or suggestion, that they cut through without *knowing* about possible car movements. In any event, the unauthorized, undirected acts of one or more of defendant's employees contrary to the established safety rules do not justify plaintiff's wilful and deliberate violation of the

rules where, as here, the violation results in injury to the employee. Violation by one is not excused by similar violations by others. One who has violated a rule cannot escape the consequences because others have done so. M.-K.-T. Ry. Co. v. Collier, 157 F. 347; and 56 C. J. S. p. 1296.

There was no evidence of habitual and customary violation of the rules, with defendant's knowledge and acquiescence, sufficient to excuse plaintiff's act in crawling under the couplers. See Dobson v. Otis Elevator Co., 324 Mo. 1147, 26 S. W. 2d 942. Habitual violation, of itself, does not have the effect of abrogation. The violation must have been both so open and so continuous as to raise the presumption that the defendant knowingly consented. Labatt, Master and Servant, p. 3005; and Lasagna v. McCarthy (Utah.), 177 P. 2d 734, 739. There is no such evidence here. The uncontradicted evidence was that the superiors of the inspectors admonished them for the violation or "called their hands for it."

Plaintiff had no duties to perform relating to the cars on track 20. He was crossing the yard, not engaged in any work demanding his attention. At that moment he had no inspection or repair work to do and could, as he was required to do, look out for his own safety and obey the rules. Voluntarily, unnecessarily, with knowledge of the attendant danger, in deliberate violation of the safety rules, and for his own convenience, he placed himself in a hazardous position. We cannot escape the conclusion that he was negligent and that his negligence caused his injury. Aerkfetz v. Humphreys, supra; Elliott v. Chicago, M. & St. P. R. Co., 150 U. S. 245, 14 S. Ct. 85, 37 L. Ed. 1068; Loring v. Kansas City, Fort Scott & Memphis R. Co., 128 Mo. 349, 31 S. W. 6; Hinson v. Atlanta & C. Air Line Ry. Co., 172 N. C. 646, 90 S. E. 772; Peterson v. L. Ry. & Nav. Co. (La.), 119 So. 759; 56 C. J. S. p. 1293; and 39 C. J. p. 879.

The safety rules were obviously promulgated to protect the yard employees against the hazards of switching operations involving the almost continuous movement of trains and cars on and off the switch tracks. They set up standards of care to which all yard workers were required to conform. Van Derveer v. Del. L. & W. R. Co., 84 F. 2d 979; Gildner v. Baltimore & O. R. Co., 90 F. 2d 635; Hudson v. Norfolk & W. R. Co., supra; Yoakum v. Lusk, (Mo. Sup.), 223 S. W. 53; Jacobson v. C. & N. W. Ry. Co., 221 Minn. 454, 22 N. W. 2d 455; Sou. R. Co. v. Youngblood, 286 U. S. 313, 52 S. Ct. 518, 76 L. Ed. 1124; and Francis v. K. C., St. J. & C. B. R. Co., 110 Mo. 387, 19 S. W. 935. The test of the propriety and sufficiency of a safety rule is whether its observance would secure safety. Certainly here if plaintiff had not gone between cars "for *any purpose* * * * *knowing* that cars or engines are *not* coming in from *either* end of the track" (Rule 7, italics ours), he would not have been injured.

But plaintiff's negligence does not bar recovery unless it was the sole proximate cause of his injury. Was his deliberate violation of the rules the sole proximate cause or was defendant also negligent, as was the defendant in Hampton v. Wabash R. Co., supra? We have found that defendant's instructions to plaintiff did not require him to go under the couplers. We have found that plaintiff was not entitled to warning or notice of the car movement. However, plaintiff seeks both to excuse his own act and to make defendant's act a negligent one upon the theory that the cars were kicked in "with extraordinary, unusual and unnecessary force" which struck the standing cars "in a manner dangerous to plaintiff."

Assuming (but not holding) that the movement was unusual and that the cars were struck with "unnecessary force," such act was not negligence as to one not entitled to any warning or notice. C. & O. Ry. Co. v. Mihas, supra. (Had plaintiff been entitled to notice, defendant's act in kicking in the cars without warning might have been negligence irrespective of the force of the contact.) Plaintiff did not contradict defendant's evidence that the speed of switching movements, and the force involved in contacts, varied with the number and kind of cars involved, the number loaded or unloaded, the number of brakes set, the nature of the cargoes and whether the cut is to be "ridden in," the elevation of the switch track and even weather conditions. Obviously, the extent of the momentum necessary for the kick in of a particular movement can only be estimated by the members of the switch crew. While the movement may have been "unusual, and not one made every day," such a movement was not negligence as to an employee who was not entitled to notice and whose duty was to assure himself that the cut was not coming in *at all.*

Plaintiff urges that there was evidence that "under some circumstances" a switchman rode the cars and set the brakes to slow the cars; and that this was not done here. However, the evidence was that none of the cars had cargoes likely to be damaged by heavy impact of the cars; and that the switch crew did not know, and could not have been expected to know, that plaintiff was under the couplers. Furthermore, plaintiff did not plead this theory of negligence and, even if he had, he failed to show that defendant owed plaintiff the duty to have these cars ridden in. Loring v. Kansas City, Fort Scott & Memphis R. Co., supra. This evidence cannot be relied on by plaintiff to show negligence. Martin v. Wabash R. Co., supra; Kirkland v. Bixby, 282 Mo. 462, 222 S. W. 462.

We are unable to find that defendant's acts were negligent. Upon the record, there was no duty upon defendant to warn plaintiff that cars were to be kicked in on track 20. (Had there been such a duty a wholly different case might be before us.) We have not found, nor has plaintiff cited, any Federal case, the ruling in

which would extend the coverage of the Act to a car inspector who, having no work to do under the couplers, crawled under them for his own convenience in violation of established safety rules and with full knowledge of the hazards involved, or which would, under the instant circumstances, extend the safe-place-to-work rule to the track beneath the couplers of the cars. Nor do we believe that Congress ever intended the Act to be so extended.

Defendant was not the insurer of the safety of its employees, and proof of injury alone does not fix liability. Proof of negligence and proof that such negligence caused the injury is necessary. Hartgrove v. C. B. & Q. R. Co., 358 Mo. 971, 218 S. W. 2d 557.

The cases cited by plaintiff are readily distinguishable. In Hampton v. Wabash R. Co., supra, Fitzsimmons v. Mo. Pac. R. Co., 294 Mo. 551, 242 S. W. 915, and Francis v. Term. R. Assn. of St. Louis, 354 Mo. 1232, 193 S. W. 2d 909, the railroad was under a duty to warn or give notice. In Allen v. Ross (Mo. Sup.), 292 S. W. 732, the dangers of plaintiff's situation "were or should have been fully known by" defendant "and were unknown to plaintiff and not plainly or obviously perceptible to his observation."

For the reasons stated, plaintiff did not make a submissible case, and defendant's motion for a directed verdict should have been sustained. Accordingly, the judgment is reversed. *Van Osdol* and *Aschemeyer, CC.,* concur.

PER CURIAM:—The foregoing opinion by LOZIER, C., is adopted as the opinion of the court. All concur except *Hollingsworth, J.,* not voting because not a member of the court when the cause was submitted.